134 N.W.2d 272 (1965)
178 Neb. 611
Terry CARPENTER and Terry Carpenter, Inc., a Corporation, Appellants,
v.
STATE BOARD OF EQUALIZATION AND ASSESSMENT, Appellee.
No. 35910.
Supreme Court of Nebraska.
April 12, 1965.
*275 Wilson, Barlow & Neff, Lincoln, for appellants.
Clarence A. H. Meyer, Atty. Gen., H. G. Hamilton, William E. Peters, Asst. Attys. Gen., Lincoln, for appellee.
Heard before WHITE, C. J., and CARTER, SPENCER, BOSLAUGH, BROWER, SMITH and McCOWN, JJ.
WHITE, Chief Justice.
This is an appeal by Terry Carpenter, a taxpayer and owner of urban real property in Scotts Bluff County, and by Terry Carpenter, Inc., a Nebraska corporation, owning both rural and urban real property in Scotts Bluff County, from the decision of the State Board of Equalization and Assessment of the State of Nebraska, made on July 28, 1964.
The record shows that after two preliminary meetings, the State Board of Equalization and Assessment, which will hereafter be referred to as the Board, decided that it would be necessary to call in all of the counties of the state for the hearing before the Board in order to perform its official statutory function. The Board approved a statutory notice of hearing to be sent to each county and informed each county that its representatives would be given an opportunity at a scheduled time to show why the assessed valuations of urban and rural real estate in their county, as shown by the 1964 abstract of assessment rolls previously submitted to the Board, should not be increased or decreased. These notices also stated that particular attention would be focused on the sales assessment ratio for sales prepared by the state Tax Commissioner's office for each county in the years 1960, 1961, 1962, and 1963. Pursuant to these notices, the Board conducted public hearings on July 21, July 22, July 23, July 24, and July 25, 1964. On these dates representatives of all 93 counties appeared before the Board and the testimony of these representatives was incorporated into the minutes of the Board and is a part of the record before this court on appeal.
Subsequently on July 28, 1964, the Board again met. The Board acted upon a motion, which was unanimously carried, and recited that, upon consideration of the testimony of the 93 counties, the statistical data available to the Board, the personal knowledge of the members of the Board, and the requirements of section 77-112, R.R.S.1943, and other applicable law, the Board found: "(1) That the sales assessment ratio, as computed, is not an entirely reliable guide, even if it were possible to use a single factor in making determinations: (2) that there is insufficient evidence to show that the various individual counties are not valuing property for taxation purposes at actual value, such actual value being defined by statute; and (3) that the abstracts of assessment as submitted by the various counties conform to law. * * * The State Board of Equalization and Assessment, therefore, accepts as conforming to law the abstracts of assessment of real and personal property submitted by the various counties to the office of the State Tax Commissioner and approve each of the same." (Emphasis supplied.)
*276 The appellant, Terry Carpenter, on behalf of himself and Terry Carpenter, Inc., appeared before the Board and requested the Board to equalize the assessment of property in Nebraska to make it conform to law, that is, 35 percent of actual value. From the action of the Board, heretofore recited, the appellants have taken this appeal.
The appellants' assignments of error, summarized, contend that the Board acted arbitrarily and capriciously and not within the law in failing to equalize the valuations of real property among the various counties and that its order did not conform to law in that it did not equalize the values of real property to bring them to the required statutory assessed rate of 35 percent of actual value. At this point, we examine the applicable principles of law involved so that we may proceed to an examination of the pertinent evidence in the case with the proper yardsticks in mind. The Constitution of this state provides that necessary revenue shall be raised by taxation in such a manner as the Legislature may direct. It provides also that taxes shall be levied uniformly and proportionately upon all tangible property. It further provides that the Legislature may prescribe standards and methods for the determination of the value of real and other tangible property at uniform and proportionate values. Art. VIII, § 1, Constitution. Pursuant to these provisions, the Legislature has provided the method of determining the value of tangible property for tax purposes. Section 77-112, R.R.S. 1943, provides as follows: "Actual value of property for taxation shall mean and include the value of property for taxation that is ascertained by using the following formula where applicable: (1) Earning capacity of the property; (2) relative location; (3) desirability and functional use; (4) reproduction cost less depreciation; (5) comparison with other properties of known or recognized value; and (6) market value in the ordinary course of trade." In our scheme of taxation, the Board acts upon the abstracts of tax assessments furnished by each of the counties. The original determination as to actual value under the statutory standard is the function of a county board of equalization. The determination of each individual county as to actual value within its county is clothed with a presumption of validity and, in the absence of evidence to the contrary, may be accepted by the Board as conforming to the law. It is fundamental that the Board has no power to readjust individual valuations within the county. It can only act to equalize the assessments between different counties in order to achieve the constitutional objective of uniform and proportionate valuations over the whole state. As we see it, the primary duty of the Board is to establish uniformity between the various counties. The basic powers and duties of the Board are set out in the applicable statute, section 77-506, R.R.S.1943, which states in part as follows: "The State Board of Equalization and Assessment shall proceed to examine the abstracts of real and personal property assessed for taxation in the several counties of the state, including the railroads and pipe lines entirely within such county, and all other property, and shall equalize such assessment so as to make the same conform to law. For that purpose, it shall have the power to increase or decrease the assessed valuation of real or personal property of any county or tax district." (Emphasis supplied.)
The proper relationship and the distinction in powers between the county boards of equalization and the Board in this state are set out in S. S. Kresge Co. v. Jensen, 164 Neb. 833, 83 N.W.2d 569, as follows: "It is the function of the county board of equalization to determine the actual value of the property for taxation purposes. While the county board of equalization acts in a quasi-judicial capacity and its valuations are final as to individual taxpayers unless appealed from, such valuations are subject to the powers of the State Board of Equalization and *277 Assessment, which powers have been described by this court as being purely incidental to a proper equalization of the assessment of the different counties of the state as returned to that body. Hacker v. Howe, 72 Neb. 385, 101 N.W. 255. Both the county board of equalization and the State Board of Equalization and Assessment, however, must give effect to the constitutional requirement that taxes must be levied uniformly and proportionately upon all tangible property. It is evident that actual value and a uniform and proportionate value may not always result in identical results. In dealing with such a situation arising in this state, the Supreme Court of the United States said: `This court holds that the right of the taxpayer whose property alone is taxed at 100 per cent. of its true value is to have his assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of statute. The conclusion is based on the principle that where it is impossible to secure both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law.' Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, [192], 67 L.Ed. 340, 28 A.L.R. 979. It could well be added that the application of this principle to the findings of the county board of equalization makes it possible for the State Board of Equalization and Assessment to fairly equalize between counties without doing injustice to individual taxpayers." (Emphasis supplied.)
We have endeavored to give a brief review of the substantive principles applicable to the Board's determination and the scope of its powers and duties. We next briefly examine the proper rules to be followed by this court in reviewing the determination of the Board. The proper rule is that we may not substitute our judgment for that of the Board. We do not pass upon the relative merits or the probative force of the evidence in the record. We review the record only to determine if the Board has complied with the requirements of the statute in exercising the powers granted to it by the Legislature. It is only where the record is clear and conclusive that the Board's action was illegal, contrary to law, arbitrary, and capricious that this court has any power to reverse the findings and the orders of the Board. Laflin v. State Board of Equalization & Assessment, 156 Neb. 427, 56 N.W.2d 469; County of Buffalo v. State Board of Equalization & Assessment, 158 Neb. 353, 63 N.W.2d 468; County of Douglas v. State Board of Equalization & Assessment, 158 Neb. 325, 63 N.W.2d 449. See, also, State ex rel. Sorenson v. State Board of Equalization & Assessment, 123 Neb. 259, 242 N.W. 609, 243 N.W. 264.
We next go to the burden of proof that the appellants must meet. When a taxpayer appeals from an action of the Board, the presumption is that the Board faithfully performed its duties and the burden is upon the appellant to prove that the action of the Board was erroneous, arbitrary, capricious, and contrary to the law. County of Buffalo v. State Board of Equalization & Assessment, supra; Hatcher & Co. v. Gosper County, 95 Neb. 543, 145 N. W. 993.
In testing the Board's action, the ordinary rules applicable to appeals to this court do not apply. A wide latitude of judgment and discretion is vested in the Board. The Board is not bound by the actual record of the evidence taken before it. No particular method or procedure must be followed. No particular kind or standard of evidence is required. It may act upon the knowledge of its own members as to value, on any other information satisfactory to it, and it is entitled to act upon the presumption that the abstracts of assessment returned by the various counties have conformed to the law. County of Grant v. State Board of Equalization & Assessment, 158 Neb. 310, 63 N.W.2d 459; *278 Fromkin v. State, 158 Neb. 377, 63 N.W.2d 332.
And, further we point out at this time that it can probably always be demonstrated that the Board, in dealing with the intangible concepts of valuation and uniformity, could never reach any mathematically precise result. Such a yardstick or criterion of equalization can never be accomplished. Approximation, both as to value and uniformity, is all that can be accomplished. Collier v. County of Logan, 169 Neb. 1, 97 N.W.2d 879. And, we have held that the object of the law of uniformity is accomplished if all of the property within the taxing jurisdiction is assessed at a uniform standard of value. State ex rel. Bee Building Co. v. Savage, 65 Neb. 714, 91 N.W. 716. Actual value is an intangible concept, is largely a matter of opinion, and there are no yardsticks by which it can be determined with accuracy. S. S. Kresge Co. v. Jensen, supra; H/K Company v. Board of Equalization, 175 Neb. 268, 121 N.W.2d 382. We note that our present statute on valuation, section 77-112, R.R.S.1943, broadens the elements that may be considered where applicable, but places no limitations on different elements that may be considered. We recently pointed out in Union Pacific R. R. Co. v. State Board of Equalization & Assessment, 170 Neb. 139, 101 N.W.2d 892, that the application of the new statute did not change the principle that the judgment as to valuation is largely a matter of opinion and is committed to the sound discretion and judgment of the Board. We have held that substantial compliance with the requirements of equality and uniformity in taxation laid down by the federal and state Constitutions is all that is required and that such provisions are satisfied when designed and manifest departures from the rule are avoided. LeDioyt v. County of Keith, 161 Neb. 615, 74 N.W.2d 455; 51 Am.Jur., Taxation, s. 152, p. 202.
In light of the above principles, have the appellants sustained their burden of proof to show that the Board acted arbitrarily and capriciously and outside of the law, or that its action was a designed and manifest departure from the permissible discretion allowed it under the statute and the applicable law thereto? We think not.
To meet the burden imposed upon them, the appellants rely almost entirely upon the sales assessment ratio compiled by the state Tax Commissioner as a criterion of valuation and uniformity. Section 77-1320, R.S.Supp., 1963, first enacted in 1945, provides that the register of deeds of each county shall submit to the state Tax Commissioner a report each year showing all sales or transfers of farm lands and town property. It excluded judicial sales until 1963 when an amendment was passed including them. Although not required by statute, the state Tax Commissioner, Forrest A. Johnson, based on these reports, computed the ratio of sales prices of urban and rural real estate to the assessed values of the same real estate for the years 1960, 1961, 1962, and 1963 in each county. In 1963, the Tax Commissioner prepared a 4-year average ratio of sales prices of rural and urban property to assessed values in each county. It should be explained that if the total prices of all property sold in any county were equal to the total and actual values of those properties for assessment purposes, the sales assessment ratio would equal 35 percent which corresponds to the legal requirement under the applicable statute that all property be assessed at 35 percent of actual value. As sales prices exceed the assessed values, the sales assessment ratio goes down from 35 percent and conversely sales prices lessen the values for assessment purposes and cause the sales assessment ratio to go up from 35 percent. It is true that the state Tax Commissioner prepared the sales assessment ratio. It is also true that the Board summoned the counties in for a hearing with respect to equalizing their assessments according to this standard. The major portion of the appellants' argument is the great disparity between the different counties *279 as to these ratio figures. They give us an extensive statistical analysis. For example, they first take the 4-year average sales ratio on rural land which is 27.35 percent. They point out that there is a variation on the sales assessment ratio from a high of 36.20 percent in Gage County to a low of 14.83 percent in Thomas County. On urban property, the proportions range from a high of 41.99 percent in Pawnee County to a low of 21.44 percent in Loup County. The urban percentages are based on a statewide average of 28.91 percent. Then, using the 1963 sales alone, appellants again point out a similar disparity between the counties.
This argument is forceful and plausibly persuasive. We note, however, that according to the appellants' own figures as presented in their brief that based upon the 4-year average rural real estate sales assessment ratio, there were 83 counties in the state that ranged from a 20 percent sales assessment ratio to a 35 percent sales assessment ratio. The state average for these 4 years was 27.35 percent which brings all 83 counties within a 7 or 8 percent range of the average ratio. This same general range is present with reference to the sales assessment ratio for urban real estate. After pointing out the disparity in these sales assessment ratios between the various counties, the appellants immediately argue the applicability of Laflin v. State Board of Equalization & Assessment, supra. They then state that the Board's determination not to take action on these sales assessment ratios shows conclusively to this court that the Board's action was arbitrary and capricious and must be found to not conform to the law.
The Board took five days in the reception of evidence. In each instance, the counties were confronted with their sales assessment ratio for the 4 years mentioned. Most of the testimony of the counties was directed to an attack upon the validity of the sales assessment ratio as a basis for finding actual value or as a standard of equalization. We cannot review this evidence in detail. We can only generalize. A great number of gross errors in the reports of sales was presented to the Board. For example, in one instance two sales of $24,000 were reported to the Board when there was only one. The scarcity and infrequency of sales in many of the counties were noted. It is a reasonable conclusion that sales of small urban properties for amounts below assessed valuation were not reported. It appears that in Lancaster County only 18 percent of the sales which should have been reported were actually sent to the Tax Commissioner for use. The evidence is overwhelming that a great proportion of these sales in the various counties were reported at inflated and premium prices due to a variety of factors. It appears that many of the sales reported included large amounts of personal property in a reported consideration that could not properly be related to the actual value of the real estate itself. In some individual cases, it appears that the Tax Commissioner did withdraw some sales because of information furnished him, but it is a fair conclusion from the record that there was no checking of the raw information in any substantial sense; nor was there the application of any uniform standard of evaluation to determine the number of bona fide sales and the amount thereof. The evidence shows that premium prices, sometimes as much as three times the actual value of the property, were paid for some properties for the purposes of completing units. For example, there was an instance where a sale was made in order to complete a seven-section ranch unit at a price of almost double the conceded actual value of the surrounding property. Many sales at premium prices were reported that were the result of an anticipated development in a certain small area on the edge of a town or community. Premium prices, in some counties, were paid for pasture land and for irrigated land that did not reflect the overall average value of the surrounding land in the county. No consideration *280 was given to the fact that time sales contracts on real estate usually reflect an inflated price. No consideration was given for sales resulting from family situations where property was bought by a farmer desiring to purchase extra adjoining land for some member of his family. Testimony shows that premium prices, much above actual value, were paid in many instances by people who take income tax advantage because they are in the higher income tax brackets. In many cases premium prices were paid as a hedge against inflation. It was pointed out in the testimony that no consideration was given to large sales where there is no crop base, such as wheat, and the purchase price often reflects the price of the crops thereon for the current year as well as the actual value of the real estate. In one case, premium prices were paid for approximately eleven parcels of real estate in an estate, because the tenants thereon had lived on the property for a long period of time and their peculiar necessity and desire for the property inflated the price way above the average actual value of the same or similar land in the community. There was considerable evidence as to spite sales. There was evidence that inferior land was purchased at much above its actual value because of a plan for retiring it in the soil bank program. A large number of the county assessors gave a detailed analysis of many individual sales reported to the state Tax Commissioner. Their evidence is persuasive that these reports furnished no adequate basis for determination of actual bona fide sales and market prices in the ordinary course of trade. Any conclusion drawn from these reports would be uncertain, conjectural, and speculative.
We point out that the Board and this court have no way of knowing what the comparative and relative impact these inequities, errors, and imperfections in the reports of sales had as between the various counties. It was obvious that they would be magnified in the counties where there were reports of very few sales. One percent of the land was reported as sold in some counties. It seems to us apparent that these factors would have a different impact or influence on a purported sales assessment ratio as to different sections of the state and as between counties. What the difference is and how it would affect the percentage ratio, the Board and this court have no way of knowing. It is a reasonable assumption, and one upon which the Board could reasonably have acted, that the above factors, inequities, or imperfections in the sales assessment ratio vary in their effect from one county to another and from one part of the state to another. Again we point out that unreliable as the raw information was, sales are only one factor under the statutory formula to be considered in testing the presumption of the validity of county valuations.
As we see it, the sales assessment ratio as compiled in this case was nothing more than the application of a statistical method to a mass of raw, unchecked, and uncertain information. It is clear to us that it does not reflect the truth and could not be used for the basis of any calculation as to disproportionate valuations between the counties. Moreover, it is not even suggested that any uniform standard of evaluation of this data was applied to it. There was neither any effort made nor any method used to pierce and examine the raw information to determine the bona fide sales and the actual consideration as between the parties.
In determining whether the Board acted arbitrarily and capriciously, we note that the state Tax Commissioner, a member of the Board, after hearing all of the evidence, voted to reject this purported sales assessment ratio as being a proper standard of equalization and valuation. When the official who compiled and presented this study to the Board rejected it himself as a standard for equalization and valuation, we fail to see how this court is in a position to declare that it was arbitrary and unreasonable on the part of the Board *281 to reject it as a proper standard for performing its duty.
As far as we have been able to discover this court has never accepted a sales assessment ratio of this nature as a valid base for the equalization of assessments. In Laflin v. State Board of Equalization & Assessment, supra; H/K Company v. Board of Equalization, supra; and County of Grant v. State Board of Equalization & Assessment, supra, similar sales assessment ratios were rejected by this court as being invalid. We point out that in the County of Grant case, supra, the county attempted to use the state sales assessment ratio that was prepared on a 5-year basis. Said the court: "From an examination of the exhibit and the comparisons therein shown as above indicated, it is conclusive that the exhibit has no value as evidence." In Sioux City Bridge Co. v. Dakota County, 110 Neb. 597, 194 N.W. 729, the Dakota County assessor chose transactions, "* * * which in his judgment presented a reasonable proportion between the consideration named and the assessed value." We point out that apparently in this case a local county assessor, not only chose a group of sales within the county, but analyzed them to determine which ones were bona fide sales. Nevertheless, appellants said in passing upon this method of valuation as follows: "While this method, no doubt, is entitled to probative force, it is manifest that it is not conclusive and is subject to many imperfections. It is a matter of common knowledge that many sales are based on trades in which the consideration is inflated. The true test in all cases is to arrive at the fair value of the property."
Nevertheless, appellants rely upon our holding in Laflin v. State Board of Equalization & Assessment, supra. In that case, a 20-year sales assessment was rejected as being too remote, but as we read this case we did not hold that a sales assessment ratio for a shorter period of time and prepared and offered in the manner as present in this case would be a valid basis for equalization. In the Laflin case, the court specifically held that the sales assessment ratio was invalid but held that the Board was arbitrary in using it for making an adjustment for 19 counties and not making a requisite comparable adjustment in Johnson County. There is no indication in the present case of such an arbitrary decision. But, on the contrary, there is an entirely consistent refusal to act upon such an invalid basis. We would have the Laflin case here if the Board had accepted the sales assessment ratio for some of the counties and rejected it in its application to the others. The Board, in this case, was faced with the dilemma of applying, in the light of Laflin v. State Board of Equalization & Assessment, supra, a sales assessment ratio on a statewide basis or rejecting it in toto. Nothing less would be accepted under the holding in the Laflin case. It would seem obvious under these circumstances that the Board was not arbitrary or unreasonable in rejecting such a false standard as the evidence demonstrated it to be.
Appellants cite no cases sustaining the validity of the application of a sales assessment ratio to the equalization process before any state board. Our research has revealed a few cases passing on the subject. In Coulter v. Louisville & Nashville R. R. Co., 196 U.S. 599, 25 S.Ct. 342, 49 L.Ed. 615, the results of a study of real estate sales in Kentucky was used in an attempt to show relationship of assessment to full value. The facts in the case do not fully disclose the nature of the study but it could hardly have been any less evaluated as to bona fide sales than the one in the case before us. The court rejected the figures. Justice Holmes of the United States Supreme Court said: "It is obvious that the accidental sales in a given year may be a misleading guide to average values, apart from the testimony that some, at least, of the conveyances did not report true prices, yet they furnish the chief weapon of attack." In May Department Stores Co. v. State Tax Commission (Mo.), 308 S.W. *282 2d 748, the court rejected a ratio study saying: "This is only mentioned to show further that the ratio study and the order of the Commission can in nowise be conclusive on matters of individual valuation. We are convinced that plaintiff did not establish a discrimination in this regard; it had the burden." In People ex rel. Hillison v. Chicago, B. & Q. R. R. Co., 22 Ill.2d 88, 174 N.E.2d 175, the Illinois Department of Revenue annually determined the percentage relationship between assessed value and full fair cash value transaction shown to be bona fide sales as established through an analysis of property transfers and other means. This case and the others that we have examined sustaining the use of a sales assessment ratio reflect a situation far different than we have here. In all of these cases there was a scientific evaluation of the raw information or data from the original sales, and there was an application of a uniform standard of evaluation in order to determine the fair value of the land involved in transactions shown to be bona fide sales.
The Legislature has required these reports of sales since 1945 but has failed to recognize them as a suitable method for valuation or equalization. Instead, the Legislature has moved to set up a uniform standard for this basis. The 1963 session of the Legislature adopted a program of statewide appraisal contained in sections 77-1301 to 77-1301.08, R.S.Supp., 1963. The objective is a comprehensive and uniform system of scientific reappraisal of real property and improvements in the State of Nebraska. This is the standard that the Legislature has set up and adopted on a statewide basis. In the light of this situation, can it be said that the Board acted unreasonably and capriciously and outside of the mandate of the law when it refused to accept a sales assessment ratio and instead acted upon the various presumptions applicable to the abstracts of assessments that were furnished it, the testimony of almost all of the county assessors, and the other information and knowledge that was available to it? We think not.
Appellants argue that some of the counties have not changed their assessments for a number of years. They argue that various counties adjusted their values according to different percentages of appraisal reports. But, the personnel, methods, and standard used by different boards appointed by the various counties vary widely. The appraisal reports were only one of the factors to be considered. The judgment as to valuation and equalization within each county is committed to the sound discretion of the Board. The various county officials appeared before the Board and explained to it why their various appraisals were accepted or rejected in part and gave the reasons therefor. Since there was no common uniform appraisal standard adopted on a state-wide basis, we cannot say that the Board was capricious or arbitrary in accepting the various explanations by the different counties as to the weight they gave their appraisals. It is argued that several counties took into consideration the valuations on similar lands in surrounding counties. Actual value is largely a matter of opinion, and we cannot say that the Board was arbitrary and capricious in failing to adjust these counties because of this factor.
Appellants argue that several county assessors admitted that their valuations were below the "actual value" level, but approximation is all that is required. A range above or below 35 percent of actual value was permissible. And, as we interpret these isolated statements, they constitute nothing more than an admission of the impossibility, under our present system, of arriving at any precise and definite value. The Board, by its action, did not indict them for their candor. And, on review, we do not feel that we could find that the Board was arbitrary and capricious in refusing to take these isolated statements and proceed to equalize all county valuations on a statewide basis. Furthermore, we *283 can find nothing in their testimony that would indicate any concession that their values were unequal or disproportionate with the other counties. The great majority of the other counties did testify that their valuations were at 35 percent of actual value. Even using the sales assessment ratio as a basis of comparison, little if any difference is shown between these counties and the ones testifying that their property was at actual value.
In closing we feel that this record does not disclose on its face, as it did in Laflin v. State Board of Equalization & Assessment, supra, that the action of the Board was arbitrary, capricious, unreasonable, and constituted a manifest and designed departure from the law. Basically, the appellants' case rests upon an invalid sales assessment ratio, rejected as being unreliable by the member of the Board who prepared it and the equivocal admissions of a few county assessors. We cannot say that the Board was arbitrary and capricious in not permitting this type of evidence to prevail. Against it, the Board weighed the presumptions applicable to the various abstracts of assessment, the positive evidence before it by the various county officials, the knowledge of members of the Board as to value, and their right to consider any other information satisfactory to them.
We do not mean to say that there was not some evidence of probative force upon which the Board could have acted. Perhaps, this court sitting as a super board of equalization, would have evaluated the evidence differently and made some adjustments, but we may not, as was said in Laflin v. State Board of Equalization & Assessment, supra, sit as a super board of equalization and pass upon the merits of the evidence. The Board alone is vested with this power and may exercise a wide latitude of judgment and discretion. In order to reverse the order of the Board, we would be required to hold the Board utterly failed to follow a reasonable course of action and that its decision was illegal, arbitrary, and capricious. We would be required to hold, in effect, that it followed a course of action that was a designed and manifest departure from the law. The Board followed a reasonable procedure, heard all of the evidence, and reached its conclusion that the appellants had failed to meet their burden. We cannot say that it was arbitrary and capricious in doing so, and in rejecting as unreliable a demonstrably false guide for equalization.
We conclude that the assignments of error predicated by the appellants herein cannot be sustained. It is ordered that the decision and final order of the State Board of Equalization and Assessment be and is hereby affirmed.
Affirmed.
McCOWN, Justice (dissenting).
We respectfully dissent. A thorough examination of the record produced from scores of official witnesses reveals such confusion in the interpretation of the constitutional and statutory terms of "valuation" and "actual value" as applied to a tax on real property, that we deem it essential to review some fundamental principles involved.
The constitutional provision, insofar as applicable, is: "Taxes shall be levied by valuation uniformly and proportionately upon all tangible property." Art. VIII, § 1, Constitution of Nebraska.
The basic rule of property taxation is that the value of the property is the basis of taxation, and the fundamental rule or standard of value is actual, market, full, true, or fair cash value. Ordinarily these are all defined as being one and the same and are encompassed in the term "fair market value." See, 51 Am.Jur., Taxation, s. 696, p. 648, s. 701, p. 652; 84 C.J.S. Taxation § 410, p. 780, § 411, p. 791; Richards v. Board of Equalization, 178 Neb. 537, 134 N.W.2d 56.
*284 Our former statutes defined "actual value" as "value in the market in the ordinary course of trade." Section 77-201, Comp.St.1929; Section 77-112, R.S.1943.
"Fair market value" is a well-defined legal term even though it "is an intangible concept, is largely a matter of opinion, and there are no yardsticks by which it can be determined with accuracy" as stated in the majority opinion. "Fair market value" means the price property will bring when offered for sale by one who desires, but is not obliged to sell, and purchased by one who is under no necessity of buying, both having reasonable knowledge of the facts.
The principles governing the ascertainment of value for the purpose of taxation are the same as those that control in condemnation cases, confiscation cases, and generally in controversies involving the establishment of just compensation. 51 Am.Jur., Taxation, s. 701, p. 653.
Many elements enter into the determination of actual value. No one element of value is controlling and all elements entering into a determination of actual value must be taken into consideration where applicable. Richards v. Board of Equalization, supra.
Section 77-112, R.R.S.1943, as amended in 1957, states: "Actual value of property for taxation shall mean and include the value of property for taxation that is ascertained by using the following formula where applicable: (1) Earning capacity of the property; (2) relative location; (3) desirability and functional use; (4) reproduction cost less depreciation; (5) comparison with other properties of known or recognized value; and (6) market value in the ordinary course of trade." The first five elements of the formula are clearly proper elements of "actual value." The sixth is actually not an element but essentially the same as the "actual value" which is to be determined. Obviously, number (6) has been treated or interpreted by many officials as meaning "market price" rather than "market value" as it is stated. "Market price" is only an element in determining "actual value" or "market value," but "market price" and "market value" are not the same. "Market price" is generally accepted as one of the best tests of the "market value" of land, but is only one element. Nowhere in the statute as now constituted does the word "price" appear. This, of course, does not mean that "market price," either of the particular land or of similar property, cannot be taken into account; because clearly it must be. It does, however, demonstrate the basic confusion which has arisen in the interpretation of constitutional and statutory language as to value for purposes of taxation.
No specific percentage can be assigned to any one element of value, nor are they necessarily equal. In our opinion, the Legislature cannot set an arbitrary formula or standard which does not reasonably reflect "actual value" or "fair market value."
We turn now to a consideration of the particular case before us. We agree with the majority opinion that the record established that the sales assessment ratio, as it was prepared, compiled, and used here, was not proper. In our opinion, this does not mean, however, that a sales price assessment ratio study, properly and uniformly compiled, and properly and expertly weighed, analyzed, tested, compared, and sampled, could not be an effective instrument of equalization.
The majority opinion proceeds on the assumption that since the sales assessment ratio as presented was ineffective, the State Board of Equalization and Assessment, hereinafter called the Board, was entitled to act upon the presumption that the abstracts of assessment returned by the various counties have conformed to law, and that the object of the law of uniformity is accomplished if all of the property within the taxing district is assessed at a uniform standard of value; impliedly, even if less than 35 percent of the actual value which the statute requires. In this respect, *285 the majority opinion relies upon the case of Sioux City Bridge Co. v. Dakota County, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340, 28 A.L.R. 979. That case involved an individual taxpayer whose property was taxed at 100 percent of its true value while all other property in the county was taxed at 55 percent of that value. That case, however, is specifically based on the principle that where it is impossible to equalize both the standard of true value and the uniformity and equality required by law, the latter requirement is to be preferred. The United States Supreme Court pointed out that to require all other taxpayers to be increased, "is to deny the injured taxpayer any remedy at all because it is utterly impossible for him by any judicial proceeding to secure an increase in the assessment of the great mass of underassessed property in the taxing district." The majority opinion here applies the principle of that case to this one. But here the action involves the Board, required by law to equalize all county assessments at 35 percent of actual value, and authorized to increase or decrease any or all. In fact, the transcript specifically shows that the Attorney General had advised the Board before the hearings that it probably could not legally set the valuations in the various counties at an average figure which would be below 35 percent of actual value. The result of the majority opinion here, on the basis of an incorrect application of the principles of a case involving the assessment of an individual taxpayer, is that the Board may disregard the specific requirement of the statute. It also determines, in effect, that it is impossible for the Board to assess at 35 percent of value, and at the same time accomplish equalization and uniformity. We do not know how it is possible to have uniformity at some percentage of actual value less than 35 percent, but impossible to have uniformity at 35 percent of actual value. The Board itself has the power to increase or decrease the valuations of each county, and we cannot agree that a simple mathematical computation can make the possible impossible when dealing with the same actual value. We believe that the effect of this portion of the majority opinion is in direct conflict with section 77-201, R.S.Supp., 1963, and with the holding in Laflin v. State Board of Equalization & Assessment, 156 Neb. 427, 56 N.W.2d 469.
Passing the question of whether the Sioux City Bridge Co. case applies to this situation, and even assuming that it does, then, since uniformity is the primary objective, there is still a constitutional and statutory obligation on the Board to decrease as well as increase the valuations of individual counties to secure the uniformity and equality required by law. How can it be said that there is equality or uniformity of any sort except in relationship to a uniform standard of value? As it was philosophically expressed by one of the witnesses: "If you start with a wrong number, you are going to come up with 35% of the wrong number."
Apparently the majority opinion accepts the statements of representatives of the counties that they had placed their values at 35 percent of what they thought actual value was, as being proof of the fact, at least where coupled with the presumption of validity. This ignores the other evidence in the record which we think established the fact that a uniform standard of value was not used by the counties. At this point also, we should state that we disagree with the holding that the Board is not bound by the record, but may act upon the knowledge of its own members as to value and on any other information satisfactory to it. If this be the rule, as applied to this case, it would be virtually impossible to successfully contest any action of the Board. Nevertheless, the record itself establishes the failure to use or apply a uniform standard of value among the various counties and a consequent lack of equality and uniformity of assessment.
The record shows that over 40 counties apparently had had professional appraisals *286 of actual value in the period from 1950 through 1962. Professional scientific appraisals are, we think, a proper method of determining actual value. The Legislature, by enactment of sections 77-1301 to 77-1301.08, R.S.Supp., 1963, has now specified that all counties must have professional scientific appraisals within the next few years. The record is replete with expressions of official opinion that such scientific professional appraisals or reappraisals will provide a much improved standard of uniformity. This can only be true, however, if these professional scientific reappraisals are required to be applied uniformly. The record indicates that for the year involved here, at least 18 counties which had had professional appraisals between 1950 and 1962, applied them 100 percent and took 35 percent of those appraisals as the assessment. At least two other counties had done likewise with respect to urban or rural property, one or the other. Twenty-two counties, however, had reduced their appraisals by various arbitrary percentages. The percentages of the appraisals which were used ranged from approximately 60 percent to 95½ percent, and in two instances, the exact amount of the reduction is not shown by the record. There were many other counties which had had professional appraisals as to which the record does not show what percentages of them were used. There is nothing in the record as to eight counties because the recording equipment broke down.
Of the counties which had appraisals in 1961 and 1962, three were using 100 percent of the appraisal figures; three arbitrarily reduced the appraisal figures to 75 percent, 76 percent and 80 percent respectively; and one county was using 100 percent on its urban property and 80 percent on its rural property. Of counties completing appraisals in 1959 and 1960, two were using 100 percent and three used percentages of 83 percent, 90 percent, and 94 percent respectively. Of counties completing appraisals in 1957 and 1958, three used them 100 percent and five reduced them to percentages varying from 80 percent to 93 percent. One county used an interesting and revealing method of arbitrary reduction. It first reduced the professional appraisal values by 29.575 percent and then took 28.57 percent of that. The reason for this involved computation was to reach the same total valuation as the county had reported in prior years. This resulted in an apparent actual value of approximately 60 percent of the appraisal. For counties completing appraisals in the years 1955 and 1956, five counties were using 100 percent of their appraisal figures and five reduced them, one to 67 percent, one to 70 percent, one to 75 percent, one to 80 percent, and one to 95.5 percent. However, the county which reduced to 70 percent, used 37 percent of that rather than 35 percent. Of counties completing professional appraisals in 1953 and 1954, three of them were using 100 percent, one used 85 percent, and one 92.5 percent. It seems clear to us from the record that at least some counties arbitrarily reduced their actual values, and that a lack of uniformity and equality is clearly apparent. Of what use to the state are appraisals, past or future, if some counties are permitted to arbitrarily reduce their values for state assessment purposes?
We agree with the majority opinion that in dealing with the intangible concepts of valuation and uniformity, a mathematically precise result can never be reached, nor perfect equalization ever accomplished. However, we cannot agree that equality and constitutional uniformity are even reasonably approximated where one county may be assessed for state tax purposes on a basis 50 percent higher than some other county, or where one county may be assessed at two-thirds of the basis applied to another county. Such disparities, in our opinion, exceed the bounds of approximation or reasonableness.
We entirely agree with the opinion of the majority that this court cannot act as a super board of equalization, nor substitute its judgment for that of the Board. We *287 are convinced, however, that on the record here, regardless of the enormity of the task, the failure of the Board to do anything was illegal, contrary to law, and arbitrary. Anyone reading the record in this case will be overwhelmed by the problems and conflicts discussed. They run the gamut of the problems involved in Nebraska in the field of property taxation. We recognize the extreme difficulty, as well as the complexity, of the decisions facing the Board, as well as the fact that it has been given few tools with which to work. Nevertheless, we cannot escape the conclusion that the constitutional and statutory requirements were not met.
I am authorized to state that CARTER and BROWER, JJ., concur in this dissent.
SPENCER, Justice (concurring).
I concur with the majority opinion herein because I do not believe the type of record before us is one on which we can say that the action of the State Board of Equalization and Assessment, hereinafter referred to as Board, was arbitrary and capricious.
The record before us is a reproduction of a tape recording of the proceedings before the Board. Because the recording device was faulty, there is no record for eight of the counties which appeared. Throughout the record, the words "not understandable" appear because the device did not pick up the conversation. I refer to it as conversation for it is no more than unsworn statements because none of those appearing were placed under oath, although the statute contemplates that the secretary of the Board will administer an oath. Section 77-503, R.R.S.1943. Further, the record abounds with statements from persons unknown, identified only by the description "voice." The appellant Terry Carpenter appeared before the Board and requested it to equalize assessments according to law, but offered no evidence of any nature.
The appearances before the Board were in response to a notice sent pursuant to section 77-508, R.R.S.1943, to the county clerk, assessor, and chairman of the county board of the 93 counties, ordering the county to appear for hearing to show why the assessed valuation of urban and rural real estate should not be increased or decreased in order to equalize the assessments in all counties. The notice stated that particular attention would be focused upon the sales-assessment ratio for 1960, 1961, 1962, and 1963.
I am in complete accord that the sales-assessment ratio as it is prepared and used is not a proper criteria for any purpose. There are too many variables which are not covered and even if it were properly used and fully analyzed it could only be a factor in testing the assessment of the type of property actually sold. I do not see how we can reject it and then use it for any purpose, as we would be required to do if we were to sustain appellants' appeal.
I fully agree it is the duty of the Board to equalize as nearly as possible the assessed value of all classes of real and personal property among the several counties and for that purpose to see that all tangible and real property is assessed at 35 percent of actual value so far as that may be possible. I realize that under present conditions, this is difficult to accomplish. That fact, however, does not relieve the Board of its responsibility. I further observe that there are a few statements in the record which if properly adduced as evidence might raise a question requiring Board action. I am not prepared to hold, however, that the Board is bound by other than competent evidence. In the absence of competent evidence of probative force otherwise, the Board is entitled to indulge the presumption that the public officials involved have conformed to law.
Briefly reviewing the unsworn statements appearing in the record, I make the following observations. There is no record on eight counties. Representatives of 66 counties *288 stated substantially that their counties were assessed as close to 35 percent of actual value as possible. Twelve counties not included in that figure, along with many who are included, are now in the process of having scientific appraisals made in compliance with the Comprehensive Real Estate Appraisal Law. This law will permit the Board to achieve a degree of uniformity of assessments between counties because the act places central supervision and a substantial degree of control with the state Tax Commissioner and the State Board of Equalization and Assessment.
Of the seven others, Gosper County cut its 1962 appraisal 10 percent after a hearing on many complaints, and accepted 90 percent as the actual value. Scotts Bluff and Banner counties used 90 percent of the appraised figures furnished them by the appraisal company as actual value, with no explanation appearing in the statement. Boone County used 87.1 percent and Greeley County cut its 1962 appraisal by 20 percent. Sioux County used 75 percent of its appraisal figure because the board felt the properties were appraised too high and assessed accordingly. Platte County used the appraisal furnished but assessed at 32 percent for urban and 28 percent for rural property.
These appraisals and all the others referred to in the statements in the record were made previous to the new law. They were made by local committees and several different appraisal companies, and no attempt was made to standardize the criteria used by them. So, ignoring the human factor, there were bound to be variations, as there were, between counties and different appraisal reports. As I see it, at best the appraisal under those conditions was merely an opinion of the committee or company employee as to the actual value to be used by the assessor to help him in determining actual value.
The assessor, as I interpret the law, was expected in each instance to determine the actual value. This was subject to review on objection by the county board of equalization. In the absence of some evidence that the values fixed by the assessor were not the actual value, the fact that they are below the figure recommended by the appraiser is not controlling. Merely the statement, therefore, that the Sioux County assessor set the value at 75 percent of the value fixed by an appraisal firm does not shift the burden to Sioux County to prove that figure to be the correct one. The burden is the other way. Under the new law, powers are given to the Board to review any changes made by the county boards of equalization in valuations made by any general reappraisal and to make such adjustments as are necessary to see that there is full compliance with the law.