IN RE VALUATION AND EQUALIZATION OF REAL AND
PERSONAL PROPERTY IN THE STATE OF NEBRASKA FOR
1979.
BOX BUTTE COUNTY ET AL., APPELLANT, V. STATE BOARD
OF EQUALIZATION AND ASSESSMENT, APPELLEE.
295 N. W. 2d 670
Filed July 15, 1980.  Nos. 42917, 42919, 42923, 42924.

William E. Peters of Peters & Chunka, for appellant Sheridan County.

William L. Howland, County Attorney, for appellant Dawes County.

Laurice M. Margheim of Bayer & Margheim, for appellant Box Butte County.

Brian C. Silverman, County Attorney, and Michael Javoronok, for appellant Scotts Bluff County.

Paul L. Douglas, Attorney General, and Ralph H. Gillan, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

HASTINGS, J.

These are appeals from the action of the State Board of Equalization and Assessment (State Board), ordering increases in the assessed valuations of real estate throughout the state. The counties involved in these appeals and the percentage increases are as follows:

| County | Irrigated | Dryland | Pasture | Range and Meadow | All Other Property |
|---|---|---|---|---|---|
| Sheridan | 23 | 62 | NA | 10 | 132 |
| Dawes | 23 | 62 | NA | 10 | 64 |
| Box Butte | 53 | 92 | NA | 53 | 172 |
| Scotts Bluff | 23 | 75 | NA | 10 | 84 |

By way of further explanation, the "All Other Property" designation includes all urban real property, rural improvements, suburban homesites, improvements on leased land, and commercial and industrial property. The appealing counties have assigned 25 errors alleged to have been made by the State Board, but they consist generally of claims of improper procedures followed by the State Board and incorrect methods employed to achieve equalization and complaints that the order of the State Board was not supported by the record and was erroneous, arbitrary, and capricious. We shall deal generally with the asserted errors as they were presented in the appellants' argument portion of their brief. It should also be noted that these four cases were consolidated for briefing and argument and were based on the same record as and argued together with *Banner County v. State Board of Equalization & Assessment, post* p. 715, 295 N.W.2d 682 (1980), and *Great Western v. State Board of Equalization & Assessment, post* p. 721, 295 N.W.2d 686 (1980).

The State Board was convened by Governor Charles Thone at 9 a.m., July 2, 1979, pursuant to a notice contained in a news release dated June 19, 1979. All members were present with the exception

of Fred Herrington, State Tax Commissioner, who because of a medical problem was confined to a hospital at that time. At that meeting testimony was given by various counties, none of which are the appellants herein, and by individual citizens and employees of the Nebraska Department of Revenue. The evidence presented by the counties appearing consisted generally of complaints of lack of equalization when compared with the valuations of their various neighbors. The state employees presented evidence of the lack of equalization as demonstrated by the investigations and audits carried on by the Department of Revenue. These employees explained how they used the Nebraska Department of Revenue Land Valuation Manual (1976 ed.), applying a plus 20 percent factor to update it to 1979, to check agricultural land, and employed assessment/sales ratios, verifications, benchmark appraisals, and Marshall and Swift's Residential Cost Handbook (1978) to compare valuations of all other classes of property.

The State Board then passed a resolution appointing the State Tax Commissioner or deputy state tax commissioner to review the county abstracts of assessments and to apply the standards and procedure to be determined by the State Board to effect statewide equalization. If such review indicated that any county's valuation should be changed, the State Board directed the scheduling of hearings for such county to show cause why such change should not be made. A second resolution was passed, directing that all agricultural land be equalized to the county which has the highest level of value for each class of land, uniformly utilizing the Land Valuation Manual, and that all other property be equalized to the average assessment/sales ratio for urban real property of the eight counties having the highest such ratios.

Pursuant to those directions, the State Department of Revenue, applying the formulas approved by the State Board, calculated the required changes

in the valuations of each of the 93 counties. The deputy tax commissioner then sent a notice of such proposed changes to each of the counties and directed that such counties appear and show cause why such changes should not be implemented. Various dates for such hearings were set, but in the case of the appealing counties herein, the hearing date was set for July 12, 1979. Notice of the proposed changes and of the hearing date was mailed on July 5, 1979. However, because of a misunderstanding on the part of the deputy tax commissioner, the amounts of the proposed changes were in error so they were recalculated, notices were mailed to the affected counties to disregard the previous notices as to the amount of change and a new notice, containing the correct change, and again setting the hearing for July 12, was mailed on July 6.

At the various show cause hearings conducted by the deputy tax commissioner as hearing officer, the representatives of many of the counties appeared and gave oral testimony. In some cases, written exhibits were offered and received, and in others, arrangements were made to submit written exhibits at later dates. Employees of the Department of Revenue were available for purposes of cross-examination by representatives of the counties. The counties seemed nearly unanimous in their opposition to the proposed changes, but were at a variance as to why. There was a consensus that each county felt it was internally equalized, and they agreed that sales of agricultural land were not a good indicator of value because of speculators and those who would pay anything for the once-in-a-lifetime opportunity to enlarge their existing farm or ranch. Many counties testified that the proposed increases would put their urban properties above the actual sale value of those parcels. Other counties complained only of the increase to commercial properties, especially in the small towns where there is little or no market.

Many counties complained that increase of valuation of rural improvements at the same rate as urban was inequitable and that many farm outbuildings were not being used and should not have their valuation increased. Some counties criticized the assessment/sales ratio as being inaccurate, or taking into consideration only one factor of valuation. Some counties criticized the use of the 1976 Land Valuation Manual, stating that it would increase values of agricultural land above the guideline level that they would have to use in 1980, as required by the 1979 Land Valuation Manual, and would therefore require an increase this year and a decrease next year. Several counties advocated that the State Board wait 1 year before implementing the 1979 Land Valuation Manual until the bugs could be worked out of it, and use 100 percent of the reappraisal values this year and adjust only those counties who have not been reappraised. Much of the evidence was offered in the form of exhibits rather than as oral testimony.

The State Board next met en banc on July 25, 1979, at 10:30 a.m., pursuant to notice given by news releases and letters to each county dated July 16, 1979. Additional hearings were held on July 26 and 30, and August 1, 6, and 13, 1979, each as authorized and directed by the State Board in open meeting at the conclusion of the preceding session. Testimony was offered by various county officials and individual citizens as well as by several Department of Revenue employees who were subjected to cross-examination by the State Board and the county representatives. Exhibits consisting of assessment/sales ratio statistics for the year 1978, average mill levies and aggregate assessed valuations for all counties, abstracts of assessments, reappraisal questionnaires returned by each county, reports of the actual valuation determination plans employed by each assessor, statistics on Nebraska farm real estate market developments in 1978-79 as furnished by the Uni-

versity of Nebraska, various land and construction cost service manuals, basic data and worksheets pertaining to verification of sales, benchmark appraisals, graphs showing comparisons among the 93 counties as to valuations for both raw farmland and other forms of property, to name a few, and letters and resolutions from individuals and counties protesting their increases or the failure of the valuations of neighboring counties to more adequately increase, were received into evidence.

Generally speaking, the recommendations made by the Department of Revenue to the State Board were formulated as to raw farm land on the basis of the 1976 Land Valuation Manual and those as to all other kinds of property, on the basis of assessment/sales ratios of urban real estate. As to the latter category, where records of actual sales were insufficient, field verifications were performed and benchmark appraisals were done, employing the Marshall and Swift Handbook for adjustments between comparables. The Land Valuation Manual was developed by the Department of Revenue after extensive research and is based generally on soil types and geographical locations. To be more explicit, agricultural land is classified as irrigated cropland, dryland cropland, rangeland and meadow, and pasture. These in turn are subclassified into valuation groups 1, 2, 3, and 4, based on the productivity of the particular soil, and, when necessary, are further subdivided. Finally, recognizing the decrease in rainfall and growing days when moving from the southeast corner of the state to the northwest corner, the state has been divided into seven land valuation areas. Each land classification and subclassification has a calculated per-acre dollar value, differing in each of the seven land valuation areas. In arriving at these valuations, information was obtained from various farm management companies, county agents, and others as to cash rent data, graz-

ing fees, crop yield data, and share rental information in the various areas, and with that information, a net return to the landlord for the various classes and subclasses was determined to which was applied a capitalization rate to arrive at a value.

We next turn to the individual complaints of error made by the appealing counties. The counties contend that they were not afforded sufficient notice of the show cause hearings, the same having been mailed on the 5th and 6th of July relating to a July 12 hearing date. Neb. Rev. Stat. § 77-508 (Reissue 1976) requires that "the board shall issue a notice to the counties which the board deems either undervalued or overvalued, and shall set a date for hearing at least five days following the mailing of such notice." The date set for hearing (July 12) was "at least five days following the mailing of such notice" (July 5). Part of the counties' complaint is that the July 5 notice was cancelled and, therefore, the next notice, dated July 6, did not give the necessary 5 days. However, the original notice of the hearing was not cancelled, only the notice of the amount of proposed increase. Clearly, the notices construed together complied with the spirit and letter of that statutory provision.

This second or corrected notice was mailed out because of an error or misunderstanding of the State Board's instructions given to the deputy tax commissioner at the board meeting of July 2. The deputy director testified that he was in attendance at a meeting of the State Board held on July 3 regarding the sales and income tax rate settings and, as a result of informal visits with the board at that time, discovered his error. The appealing counties would have us hold that somehow this constituted an additional meeting of the State Board regarding equalization without proper notice in violation of the open meetings law, Neb. Rev. Stat. § 84-1414 (Cum. Supp. 1978). This is a hyper-technical and invalid applica-

tion of that law to the existing facts and circumstances and the contention is without merit.

Quite apart from the requirements of notice, it is contended that as a matter of fair play, the 5-day notice was insufficient for the counties to adequately prepare their evidence. In this regard, it must be remembered that the State Board may not meet until the "abstracts of assessment have been submitted by the county assessors," Neb. Rev. Stat. § 77-505 (Reissue 1976); that the county assessor need not forward the abstract of assessment before July 1 of each year, Neb. Rev. Stat. § 77-1514 (Reissue 1976); and that the State Board must enter its order as to equalization of valuations and certify the same to the various counties not later than August 15, Neb. Rev. Stat. § 77-509 (Reissue 1976). From a consideration of the totality of the circumstances viewed against the backdrop of such a Herculean requirement imposed upon the State Board, we cannot say that there was a lack of substantial due process in this case.

The notices of hearing are further criticized because the proposed changes were substantially higher than the ultimate adjustments adopted by the State Board. It is difficult for us to comprehend how a party is prejudiced in its preparation for defense because it has to prepare for more dire consequences than those which actually accrue. This complaint, as it is framed, borders on the frivolous.

The counties argue that there were additional procedural defects, including the failure to permit cross-examination by each county of the witnesses presented by every other county; that the notices referred only to proposed increases in real estate valuations, but that inquiry was also made as to the valuation of personal property; and that after the Department of Revenue had presented its evidence, there was no opportunity given the counties to respond.

As it was, the oral evidence consisted of almost 2,000 pages of testimony, to say nothing of five transfer cases full of documentary evidence. The practical limitations of time and the enormity of the task to be accomplished simply could not permit unfettered cross-examination of every witness as to every minuscule detail.

> It is apparent that a procedure which might be suitable for a hearing involving relatively few parties would not be practicable where the parties are numerous and the issues complex. There are practical difficulties which prevent a strict and literal application of the Administrative Procedures Act to the proceedings of the state board where the board is attempting to equalize the valuation of real estate in all 93 counties.

*County of Blaine v. State Board of Equalization & Assessment,* 180 Neb. 471, 474, 143 N.W.2d 880, 883 (1966).

As to the complaint that inquiry was made as to personal property, without notice, there was no prejudice shown. No change was made by the State Board in the valuations of personal property in any of the counties appealing. In fact, only Lancaster County had any change in personal property valuations.

The second complaint, that the counties were not permitted to respond to the testimony given by Department of Revenue employees, is not supported by the facts. The contention refers to the August 1 State Board meeting when certain testimony was presented to the board. No county requested such opportunity and there is no evidence that anyone appearing before the State Board was denied the opportunity to be heard. A special county attorney representing Box Butte County was specifically told that if he wanted time for rebuttal after the Department of Revenue had presented its case, he would be

afforded that opportunity. As a matter of fact, he and other representatives of several counties did participate at the July 26 hearing which, for all intents and purposes, completed the presentation of the evidence by the Department of Revenue.

The counties insist that Neb. Rev. Stat. § 77-507, which provides that "The board shall direct the Tax Commissioner to hold such hearings as are necessary to enable him to advise and assist the board in the performance of its duties under the provisions of this section," and Neb. Rev. Stat. § 77-508, which states that "The board may direct the Tax Commissioner to hold such [show cause] hearings to expedite the equalization process," are unconstitutional and, further, that the delegation of that authority of the deputy tax commissioner was improper and unlawful. It seems to be the position of the counties that, because the function of the State Board is quasi-judicial in nature, any activities performed by the Tax Commissioner or anyone else in furtherance of that function are also quasi-judicial in nature. This is not true. We have no quarrel with the position of the counties that the State Board acts in a quasi-judicial capacity because it does in fact hear evidence and "decides a dispute of adjudicative fact." *Richardson v. Board of Education, ante* p. 18, 24, 290 N.W.2d 803, 808 (1980). However, the officer conducting the hearings, in this case the deputy tax commissioner, only gathered evidence and made recommendations to the State Board. He decided no "dispute of adjudicative fact."

The counties cite *County of Sioux v. State Board of Equalization & Assessment,* 185 Neb. 741, 178 N.W.2d 754 (1970), in which we said:

Without reference to the constitutionality, which has been argued strenuously herein, we state that the State Tax Commissioner can hold only an administrative hearing, and not a discretionary or a quasi-judicial one,

because the power of the state board cannot be delegated to the State Tax Commissioner. Because of the result we reach herein, it is not necessary to discuss the constitutionality of the acts or whether the hearings held by the State Tax Commissioner were quasi-judicial ones.

*Id.* at 742-43, 178 N.W.2d at 755-56.

The hearings held here by the deputy tax commissioner were not quasi-judicial, but were administrative and, therefore, did not constitute a delegation of the power of the State Board.

The counties also complain that the delegation of the duty to hold hearings to the deputy tax commissioner was improper. The counties cite Neb. Rev. Stat. § 84-802 (Reissue 1976), which provides that a deputy shall perform the duties of his principal pertaining to his own office when the principal is absent or disabled but "when an officer is required to act in conjunction with or in place of another officer, his deputy cannot supply his place." The answer to that contention is simply that the Tax Commissioner, when authorized to conduct fact-finding hearings under the statutory scheme previously mentioned, is not acting as a member of the State Board, but is acting as the Tax Commissioner. It was, therefore, proper for his deputy to carry out those functions.

The counties object that, prior to holding the show cause hearings, the State Board failed to find that equalization could not be made without increasing or decreasing property values. The statute, Neb. Rev. Stat. § 77-508, merely states that "In the event it shall appear to the State Board of Equalization and Assessment that a just, equitable and legal assessment . . . cannot be made without increasing or decreasing the valuation . . ., the board shall issue a notice to the counties which the board deems either undervalued or overvalued . . . ." At its original

hearing, the State Board determined the guidelines for equalization and, on the basis of the preliminary information furnished by the Department of Revenue, instructed the deputy director to send out the notices. Certainly it is implicit in that action that a finding of non-equalization had been made. Quoting from *County of Blaine v. State Board of Equalization and Assessment, supra* at 472, 143 N.W.2d at 882: "Section 77-508, R. R. S. 1943, provides that if the state board finds that it is necessary to change the valuation . . . , the board shall issue a notice to the county and set a date for hearing." The purpose of such notice is to give the affected counties an opportunity to appear and meet the challenge to their valuations. Of course, a final determination in that regard could not be made until and unless such hearings are first held. We hold that there was substantial compliance with this statutory requirement.

The counties challenge the correctness of the assessment/sales ratios employed by the Department of Revenue and finally accepted by the State Board. Dennis Donner, systems analyst supervisor of the Department of Revenue, testified that each of the 93 counties furnished to the Department of Revenue the basic information as to sales from which the assessment/sales ratio was computed. This information was found on Forms 521, Confidential Real Estate Transfer Statements, which were filed by the grantees at the time of recording the various deeds, reflecting the consideration paid by them. The forms were then compiled by the county assessors under directions from the Department of Revenue, which required that unreliable sales that were non-indicative of true value, such as sales of undivided interests and sales between relatives, be eliminated. This information was placed into a computer and assessment/sales ratios were constructed for each individual sale as well as for the

aggregate sales. A copy of its printout was sent to each county for correction. Field verifications of sales were made in those counties where the number of sales was less than 3 percent of the total properties in existence. Where necessary because of the 3 percent requirement, benchmark appraisals were also made. All corrections and additions were incorporated into the data on hand and final assessment/sales ratios for non-agricultural land and all improvements in the aggregate and for urban residences only were computed.

The appealing counties complain that there was no attempt by the State Board to further verify the figures furnished to it by the county assessors and the employees of the Department of Revenue. However, this overlooks the important question of who has the burden of proof. "We have consistently affirmed the rule that the burden of proof is on the appellant to establish that the action of the State Board of Equalization and Assessment was erroneous, arbitrary, and capricious." *County of Sioux v. State Board of Equalization & Assessment, supra* at 202, 207 N.W.2d at 221. "The State Board has a wide latitude of judgment and discretion in equalizing assessment of property." *City of Omaha v. State Board of Equalization & Assessment,* 181 Neb. 734, 738, 150 N.W.2d 888, 891 (1976). "We do not pass upon the relative merits or the probative force of the evidence in the record. . . . [The presumption is that the Board faithfully performed its duties and the burden is upon the appellant to prove that the action of the Board was erroneous, arbitrary, capricious, and contrary to the law." *Carpenter v. State Board of Equalization & Assessment,* 178 Neb. 611, 617-18, 134 N.W.2d 272, 277 (1965). "In order to reverse the order of the Board, we would be required to hold the Board utterly failed to follow a reasonable course of action . . . ." *Id.* at 629, 134 N.W.2d at 283. We can make no finding from the record before

us that the method utilized by the State Board to compute the assessment/sales ratios utterly failed to follow reasonable standards.

The appealing counties' final assault against the State Board's action relates to its claimed arbitrariness in dividing real estate into two divisions and the utilization of different methods of equalization without showing any correlation between and among the various procedures.

Historically, although both damned and praised, the assessment/sales ratio has been employed as an accepted tool of equalization. However, as we have previously pointed out, both the county representatives and the Department of Revenue officials were practically unanimous in expressing their opinions that, at the present time at least, sales were a poor indicator of actual value of farmland. This was described as being the result of practically all farm sales being made to adjoining owners who were anxious to take advantage of the rare opportunity to add a contiguous tract to their present operating units. Consequently, there was general agreement that the prices actually paid for many farms exceeded their true value. Frank Frost, administrator of the property tax division of the Department of Revenue, in his testimony, supported those findings. Additionally, he said that "years of investigation of the market would lead us to believe that the earning capacity is probably the only common denominator you have in the analysis of rural sales." Mr. Donner testified that there were not sufficient farm sales to establish where the agricultural land ratios would set as opposed to the actual residential ratio. Finally, Herbert Kollmorgen, graduate soil scientist, agronomist, and conservationist for over 40 years, and the man primarily responsible for the 1976 Land Valuation Manual, ventured the opinion that utilization of the income capitalization approach was about the only way that "you can actually get real equali-

zation." He also told how in 1973, when the manual was first developed, he had obtained the actual selling prices of farms from the confidential transfer statements, and after plotting them on sectionalized maps of the counties, "found we were fairly close to the income approach that we used in the manual."

We feel that there was ample justification for the State Board to utilize different methods of equalization in what we feel were logically distinguished kinds of property.

The State Board rejects the contention of the counties that there was no correlation between the two methods of equalization, i.e., income approach as to farmland and assessment/sales ratios supplemented by verifications and benchmark appraisals as to the remaining property, and insists that the burden of proof is upon the counties to show a lack of correlation in the record. We are not in agreement with this position. In *City of Omaha v. State Board of Equalization & Assessment, supra* at 737, 150 N.W.2d at 891, we said:

> The record here shows that the foundation for the State Board's equalization order was an assessment-sales ratio in more than a third of the counties; scientific appraisals in some counties; and was indefinite in other counties. The record does not reveal the basis of correlation, or the basis of application, of the methods used for measuring and testing uniformity.

As pointed out above, there was evidence in the record from which the State Board could conclude that the income capitalization or land manual approach established reasonably accurate valuations of farmland.

What evidence is there of accurate valuations of property other than farmland? In *County of Gage v. State Board of Equalization & Assessment,* 185 Neb.

749, 753, 178 N.W.2d 759, 762 (1970), we said that the "consistent use of reasonably current reappraisals, done under uniform conditions and regulations approved by the State Tax Commissioner . . . meet the constitutional test of uniformity." According to Mr. Donner, Jefferson, Thayer, Johnson, Douglas, Dodge, and Saunders Counties all had reappraisals during the years 1977, 1978, or 1979. These counties had consistently the highest assessment/sales ratios and also were at or near the high point of 120 percent of manual for agricultural lands. Perhaps more graphically demonstrating the correlation existing between the two methods of equalization is the following listing of counties showing the dates of reappraisals and the percentage changes found necessary by the State Board to achieve equalization:

| County | Year of Appraisal | Irrigated | Dryland | Pasture | Range and Meadow | Other |
|--------|-------------------|-----------|---------|---------|------------------|-------|
| Jefferson | 1977 | 0 | 0 | 0 | 0 | 0 |
| Thayer | 1978 | 0 | 0 | 0 | 0 | -12 |
| Johnson | 1976-77 | 4 | 4 | 4 | 4 | - 4 |
| Dodge | 1978 | 8 | 8 | 8 | NA | - 6 |
| Saunders | 1977-78 | 9 | 5 | 0 | NA | 0 |
| Adams | 1977-78 | 20 | 20 | NA | 10 | 29 |
| Boone | 1978 | 8 | 8 | 8 | 8 | 4 |
| Douglas | 1978 | NA | 5 | 5 | NA | 0 |
| Polk | 1978 | 10 | 10 | 0 | 0 | 10 |
| Sarpy | 1978 | 9 | 5 | 0 | NA | 5 |
| York | 1978 | 0 | 0 | 8 | 0 | 16 |

As stated in *County of Sioux v. State Board of Equalization & Assessment, supra* at 747, 178 N.W.2d at 758: "It is possible, and probably necessary, to use different methods for some of the counties, but the record must show the correlation between the various methods used in the attempt to achieve a reasonable degree of uniformity." We believe that such correlation has been shown and that the action of the State Board has achieved a reasonable degree of uniformity.

Perhaps one further point deserves comment. The Department of Revenue, in presenting its evidence, made reference on several occasions to the assumption that there existed in the state good intra-county equalization, as a justification for its recommendation of the use of different tools in attempting to achieve statewide equalization. It is not entirely clear from the record whether the reference was to all classes of property, agricultural and nonagricultural alike, or only to and within the class of nonagricultural alone. If it was in regard to all property, it was an invalid assumption and one discarded by the State Board because, very obviously, by authorizing different rates of increases to the two main classifications of property, it recognized a lack of equalization. If the assumption was limited to nonagricultural property only and the use of the assessment/sales ratio for urban residences to adjust all nonagricultural property, the Department's position might be more tenable. We say that because, if all nonagricultural land was equalized within a particular county, the application of the same percentage increase to that category would maintain the same degree of equalization within the class. However, even without regard to any such assumption, reference to the following statistics taken from State Board meeting exhibits 11 and 16, respectively, showing first the aggregate ratios for all nonagricultural property and then those for urban residential only, will demonstrate the soundness of the action taken by the State Board.

| County | Aggregate All Property | Urban Residential Only |
|---|---|---|
| Banner* | 7.70 | 7.70 |
| Box Butte | 11.00 | 11.62 |
| Dawes | 18.21 | 17.76 |
| Morrill | 13.81 | 13.09 |
| Scotts Bluff | 16.22 | 16.39 |
| Sheridan | 12.89 | 12.83 |

(* No sales. Based on benchmark appraisals for all types.)

It is apparent that the differences between the two ratios are so negligible as to have little if any effect on the ultimate figure. Extending these comparisons statewide is even more convincing. Of the remaining 87 counties, 3 showed ratio disparities of 2.1, 2.4, and 6.2 percent; 10 disclosed differences of from 1.1 to 2 percent; 24 revealed diversities of from 0.6 to 1 percent; and 44 manifested dissimilarities of 0.5 percent or less. Six counties had no nonagricultural aggregate ratios which could be compared.

In the final analysis, after utilizing the assessment/sale ratios for urban residential property of the eight highest counties as a starting point in order to attempt to achieve equalization throughout the state, the Department of Revenue tested the resultant average ratio of 35 percent. Its surveys disclosed that using such a ratio would place more than 50 percent of all properties over 35 percent of actual value. Therefore, it recommended use of an assessment/sales ratio of 30 percent which in its opinion would achieve 35 percent of actual value for the vast majority of nonagricultural land in Nebraska. Likewise, the beginning point for agricultural land was 30 percent over the 1976 Land Valuation Manual. However, after further research, the Department of Revenue offered evidence that an increase of only 20 percent over the manual was necessary to equalize that division of property with all other classes of property at actual value. We have previously referred to the correlation which existed between the two methods.

Considering all of the evidence, the State Board perceived these recommendations as forming a reasonable basis to achieve equalization of all classes of property throughout the state at 35 percent of actual value. The evidence supports the action of the State Board and the appealing counties have failed to prove that its action was erroneous, arbitrary, or contrary to law.

The orders of the State Board of Equalization and Assessment setting the values of the various classifications of property in the appealing counties are supported by the record, were correct, and are affirmed.

AFFIRMED.