In re Valuation and Equalization of Real Property in the State of Nebraska for 1966.
S. K. "Bob" Hanna, a rural landowner in Thomas County, Nebraska, appellant, v. State Board of Equalization and Assessment of the State of Nebraska, appellee.
Ralph P. Vinton, a rural landowner in Hooker County, Nebraska, appellant, v. State Board of Equalization and Assessment of the State of Nebraska, appellee.
County of Arthur, appellant, v. State Board of Equalization and Assessment of the State of Nebraska, appellee.
County of Cherry, appellant, v. State Board of Equalization and Assessment of the State of Nebraska, appellee.
County of McPherson, appellant, v. State Board of Equalization and Assessment of the State of Nebraska, appellee.
County of Grant et al., appellants, v. State Board of Equalization and Assessment of the State of Nebraska, appellee.
County of Blaine, appellant, v. State Board of Equalization and Assessment of the State of Nebraska, appellee.
County of Chase, appellant, v. State Board of Equalization and Assessment of the State of Nebraska, appellee.
150 N. W. 2d 878

Filed May 19, 1967. Nos. 36441, 36442, 36443, 36445, 36446, 36449, 36455, 36462.

H. Alan Curtiss, Guy Curtis, Joseph J. Divis, Firmin Q. Feltz, Richard L. Spittler, and McGrath, North, Carroll & Nelson, for appellants.

Clarence A. H. Meyer, Attorney General, and Homer G. Hamilton, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, SMITH. McCOWN, and NEWTON, JJ., and WHITE, District Judge.

NEWTON, J.

The above entitled cases are appeals from the State Board of Equalization and Assessment which, for convenience, will hereinafter be referred to as the State Board. They were consolidated for the purpose of briefing and argument, and deal primarily with the 1966 equalization of rural lands in the several counties involved herein. There were changes made, in some instances, in the assessment of other categories of property within these counties, but reference to the record, the briefs, and the presentation by oral argument discloses that appellants were primarily interested in, and limited their protest to, the proposition of assessment and equalization of rural or agricultural lands. In no instance does the record disclose sufficient evidence to justify a finding that any of the counties concerned were

valued for assessment purposes in excess of actual value. The sole question presented is whether or not appellant counties were properly equalized in relation to each other and to other counties within the state.

Of the eight counties, all except Cherry County had had recently completed, state approved, county reappraisals as provided in section 77-1301, R. R. S. 1943. Such reappraisals in these seven counties, and in nine other counties, were accepted by the State Board as the sole criterion for the determination of actual value. Where the values found in such reappraisals had been reduced, for assessment purposes, by county boards of equalization, such values were restored to reappraisal levels. No other factors indicative of actual value were considered by the State Board in counties where appraisals were available; in connection therewith, the State Board found: "That a professional and scientific appraisal conducted in accordance with law by an approved appraisal company is the best evidence of actual value."

In Cherry County, and in 37 other counties within the state, the action taken by the State Board was based on a sales-assessment ratio. In this connection, the State Board found that such sales-assessment ratios must necessarily be used in the absence of more conclusive evidence, and that: "* * * such sales-assessment ratios adopted for 1966 equalization purposes have been duly adjusted on the basis of all the evidence available."

Regarding perimeter studies, the State Board found: "That the evidence regarding perimeter values was conflicting in many instances and was not of such a nature so as to provide a reasonably reliable basis for equalization between counties."

In fixing sales-assessment ratios, only sales occurring within the past 1-year period were considered. As a result, in a number of counties there were not enough sales available to provide a reliable base for equalization on a sales-assessment ratio basis. It appears that following the decision in Laflin v. State Board of Equalization

& Assessment, 156 Neb. 427, 56 N. W. 2d 469, wherein this court ruled that sales occurring 20 years in the past were too remote to be entitled to consideration, there has been a swing to the opposite extreme. The State Board does not hesitate to use scientific appraisals which are 2, 3, or even 5 years old and can reasonably do so if values so found are adjusted to allow for any fluctuations in actual value since the completion of the appraisals. There would not appear to be any sound reason for not, in like manner, using sales occurring in the past few years where necessary to get a reasonable sales-assessment ratio, provided they also are adjusted to allow for any fluctuation in actual values in the interim.

In making up its sales-assessment ratios, the State Board screened out all sales which were not deemed to have been made on an "actual value" basis. Yet, notwithstanding the care used in determining sales-assessment ratios, a wide divergence in such ratios as between counties resulted. The sales-assessment ratios varied over the state from 116.89 in Thomas County to 23.78 in Rock County. In most instances these discrepancies remain unexplained, but they do exist despite the finding of the State Board that all sales considered "have been duly adjusted."

For purposes of equalization, there is perhaps no single method of determining actual value which can be relied upon. In the 16 counties which had had professional appraisals, a number of such appraisals had occurred several years in the past; yet, the old appraisal figures are still used for assessment purposes without any adjustment to correct for fluctuations in values occurring since completion of the appraisals, and such appraisals were accepted for equalization purposes. Perimeter studies took into account only lands lying within 1 mile of county lines. In some instances, values of such lands may be representative of the average of rural lands within the counties, but an assumption that such is the

case cannot be justified without substantiating facts or evidence and the State Board found such studies to be unreliable.

Despite these uncertainties, a representative of the Tax Commissioner's office testified that proposed changes in valuations to arrive at an equalization of the various counties were determined in 16 counties on the basis of professional appraisals, in 38 on the basis of the sales-assessment ratios, and in the remainder on the basis of perimeter studies.

The seven counties involved in this action which had had professional appraisals were all appraised by the same firm, and reference to the report of such appraisals reveals that in considering sales in connection with the arrival at actual values in these counties, the prices paid were considered on a 100 percent basis whereas the State Board, in figuring sales-assessment ratios for equalization purposes, used only 90 percent of the purchase prices. Deviations resulting therefrom would, however, be slight. The evidence generally discloses and the appraisers' report verifies that income on investment in rural lands in the counties concerned runs from 1 percent to $2\frac{1}{2}$ percent. Such a rate of return is far below that received from normal investments and although it may be true that values for sale purposes approach the actual values found in the appraisals and by the State Board, it would appear that little if any weight has been given to the factor of "earning capacity" and that considering the low earning capacity, unusual conditions of some type may have influenced sales in the area.

It is recognized that the State Board has a very difficult task in equalizing between counties and with that in mind, this court has ruled that: "When a taxpayer appeals from an action of the Board, the presumption is that the Board faithfully performed its duties and the burden is upon the appellant to prove that the action of the Board was erroneous, arbitrary, capricious, and

contrary to the law." Carpenter v. State Board of Equalization & Assessment, 178 Neb. 611, 134 N. W. 2d 272. But it is the duty of the State Board to give effect to the requirement that taxes be levied uniformly and proportionately upon all tangible property. Art. VIII, § 1, Constitution of Nebraska. It is the primary duty of the State Board to establish uniformity between the various counties. § 77-506, R. R. S. 1943; Carpenter v. State Board of Equalization & Assessment, *supra*. On the basis of the record applicable to the eight interested counties and to equalization on a state-wide basis, it appears that the action of the State Board cannot be sustained. No uniform approach was adopted for the purpose of equalization among the various counties of the state. Such a uniform approach was probably impossible under the circumstances and the State Board is, of course, bound to consider all factors affecting actual values. Nevertheless, the record must sustain the action of the State Board and, in the absence of a clarification regarding the factors upon which the State Board relied and a rationalization of the relationship existing between the various factors on which the State Board acted, it is impossible for this court to ascertain that a constitutionally required uniformity between counties has been attained. The available evidence points to the contrary. The sales-assessment ratios adopted by the State Board, notwithstanding that such ratios have certain inherent deficiencies, reveal varying discrepancies in the assessed values adopted for the various counties, which discrepancies in most instances are not explained in the record. Certain counties have very low sales-assessment ratios. Examination of the record pertaining to those counties does not satisfactorily reveal or explain the low sales-assessment ratios attributable to them. Under such circumstances, it must be concluded that the constitutional requirement of uniformity has not been attained and that the action of the State Board is illegal, contrary to law, arbitrary, and capricious, neces-

sitating a reversal of the action of the State Board in regard to the assessment of rural lands in all eight counties.

REVERSED.

SMITH and McCOWN, JJ., concur in result.

SPENCER, J.; concurring.

I am in accord with the majority opinion herein, but believe some reference should be made to the Brandt reappraisal which was used by the State Board to raise the valuations.

I question how scientific an appraisal may be when it is subsequently raised to meet an objection, particularly where it is necessary to juggle figures to do so. The Brandt Appraisal Company submitted an appraisal report to the Tax Commissioner for approval. It was not approved. Brandt then reconstructed his appraisal by revising it upward. In this respect, Senator Paxton's testimony on a conversation with Brandt is illuminating. Portions of that testimony are as follows: " 'Of course, I appraised the property at $25 an acre. I took it to the Tax Commissioner's office and he turned it down. He said, "I'll never approve it," and he said, "You'll never get your other 10 percent of the money for the appraisal." ' GOVERNOR MORRISON: Who is 'he'? MR. PAXTON: The Tax Commissioner, Mr. Dworak, * * * GOVERNOR MORRISON: Mr. Brandt said that? MR. PAXTON: Yes, sir, Mr. Brandt said, 'I have to earn a living, I expect to get more jobs from the Department, Tax Commissioner's office, so what could I do but go home and do as he directed, so I did.' Now that was the gist of the conversation."

Brandt was asked why he changed his valuations after he had made a scientific appraisal. His answer was: "My opinion changed." Brandt testified: "The first year I set values giving less weight to sale price or market value." Brandt also testified that rule 24 was enacted by the Tax Commissioner after Brandt had appraised three counties. This rule provided in

effect that actual value was within 10 percent of selling price, or that a 10 percent variation would be allowed from sales-assessment ratio, and that if it was more than a 10 percent variation, the appraisal would not be approved. This caused Brandt to change his opinion. Rule 24 was revoked by the Tax Commissioner shortly after the reappraisal, and is no longer effective. It would seem obvious that the counties involved herein should not be penalized by a rule which will not be applied to future appraisals.

Brandt's testimony would indicate that considerable weight was given to an analysis of sales in the 6-county area, yet only 10 sales throughout the 6-county area, covering a 5-year period, were used. These were later supplemented by three others. The 13 sales were distributed as follows: None in McPherson County; one in Arthur County; one in Grant County; one in both Grant and Hooker counties; three others in Hooker County; two in Thomas County; and five in Blaine County. Obviously, unless the sales could be shown to be truly representative of the entire area, there are too few sales on which to place much reliance.

There was no investigation of the actual income of the land sold, nor any computation of the rate of return. Brandt assumed a hypothetical ranch, not too far and not too close to market, computed a hypothetical profit from that ranch, and worked from that formula. His first report was based on a 4 percent return. This he lowered to 2½ percent, to justify the revised figures. It is of interest to note that in one of the sales analyzed by Brandt, he suggests that if the land involved were rented it should net a return of 4.43 percent. Brandt concedes that it is not possible to carry a ranch on borrowed money with a 2½ percent return. For appraisal purposes for the six-county area, it should be apparent that a 2½ percent return is too low.

Brandt concedes that none of the sales used by him were as well balanced as his hypothetical ranch, for

which he assumed 8,240 acres. Only one of the sales exceeded that figure. Only two others even approached it. They were 7,034 acres and 6,245 acres. Two of the others were for 4,100 and 4,516 acres. Five of the sales were between 2,000 and 3,010 acres, and the three others were 1,250, 1,280, and 1,300 acres respectively.

The record is undisputed that McPherson County, which had no sales, is approximately 98 percent pasture land. A sale which included cultivated land, which many of the sales considered did, would not be representative for McPherson County. It would serve no useful purpose to analyze the sales used. Suffice it to say that some of them contained factors which would need further explanation before being used, and that they are too few and not sufficiently representative on which to base a sales-assessment ratio study.

The county boards of equalization for the six-county area conducted hearings and reached conclusions that the rate of return used by Brandt in revising his figures was not realistic, and rolled back the valuations to approximate the first appraisal. The State Board raised the valuations to restore the roll-back, so that the action of the State Board approved the final Brandt figures. I believe this to be erroneous, and would have decided these cases on that issue rather than leaving the issue undecided, as the majority opinion does.